# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| RONALD SUOKKO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ACCURIDE CORPORATION, JOHN W. RISNER, RICHARD F. DAUCH, KEITH E. BUSSE, LEWIS KLING, ROBIN J. ADAMS, ROBERT E. DAVIS, and JAMES R. RULSEH, | ) ) ) ) ) ) | Case No. 3:16-cv-0212-RLY-MPB |
| Defendants. | ) ) ) ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDING ................................................................. 1

FACTUAL BACKGROUND: THE MERGER CONSIDERATION IS INADEQUATE
    AND IS THE RESULT OF A FLAWED SALES PROCESS ........................................... 2

LEGAL STANDARD AND ARGUMENT ................................................................. 3

I.      The Temporary Restraining Order and Preliminary Injunction Standard ......................... 3

II.    Plaintiff Is Likely to Succeed on His Exchange Act Claims ................................................ 4

      A.    Materiality is the Lynchpin to a Section 14(a) Claim, as all the Elements Fall
            into Place Once Materiality is Established ............................................................. 4

      B.    The Proxy Omits Material Information Necessary for Accuride's Shareholders
            to Assess the Fairness of the Proposed Merger, Rendering it Misleading.............. 6

            1.    Information and Projections Necessary to Assess the Non-GAAP
                  Projections Included in the Proxy ............................................................. 6

            2.    Whether Certain Parties That Expressed Interest in Acquiring Accuride
                  Are Currently Bound by Standstill Agreements ....................................... 10

            3.    The Terms of Accuride Management's Post-Merger Employment
                  Agreements and When Discussions Regarding Their Continued
                  Employment Occurred ............................................................................. 11

            4.    The Feasibility of Refinancing the Company's Senior Notes and
                  Purported Risks Inherent in Refinancing .................................................. 13

             5.    Information Concerning Whether Deutsche Bank Has Provided or Is
                  Currently Providing Services to Cetus Capital, LLC or its Affiliates ...... 14

            6.    Information Necessary to Assess Deutsche Bank's Selected Companies
                  Analysis and Selected Transactions Analysis ........................................... 15

III.   Accuride's Public Shareholders Will Be Irreparably Harmed Absent a Preliminary
      Injunction ................................................................................................................ 17

IV.   The Balance of Hardships Tips in Plaintiff's Favor and an Injunction Is in the Public
      Interest...................................................................................................................... 18

V.     No Security Is Necessary ......................................................................................... 20

  CONCLUSION........................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*,
   No. SACV 14-1214 DOC(ANx), 2014 U.S. Dist. LEXIS 156227
   (C.D. Cal. Nov. 4, 2014) .................................................................................................... 17, 19

*Bader v. Wernert*,
   No. 1:15-CV-375-TLS, 2016 U.S. Dist. LEXIS 50614 (N.D. Ind. April 14, 2016) .......... 20, 21

*Bender v. Jordan*,
   439 F. Supp. 2d 139 (D.D.C. 2006) ...................................................................................... 21

*Brown v. Brewer*,
   No. CV 06-3731-GHK (JTLx), 2008 U.S. Dist. LEXIS 108904 (C.D. Cal. July 14, 2008) ...... 5

*Brown v. Brewer*,
   No. CV 06-3731-GHK (SHX), 2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) ........ 5

*Chambers v. Briggs & Stratton Corp.*,
   863 F. Supp. 900 (E.D. Wis. 1994) ...................................................................................... 18

*City of St. Clair Shores General Emps. Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.*,
   635 F. Supp. 2d 783 (N.D. Ill. 2009) ...................................................................................... 5

*David P. Simonetti Rollover ISA v. Margolis*,
   No. 3694-VCN, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008) .................................. 14, 20

*Domanus v. Lewicki*,
   857 F. Supp. 2d 719 (N.D. Ill. 2012) ...................................................................................... 4

*Grote v. Sebelius*,
   708 F.3d 850 (7th Cir. 2013) .................................................................................................... 4

*Gutierrez v. City of E. Chi.*,
   No. 2:16-CV-111, 2016 U.S. Dist. LEXIS 138374 (N.D. Ind. Sept. 6, 2016) ......................... 21

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
   607 F.3d 453 (7th Cir. 2010) .................................................................................................. 20

*In re 3Com S'holders Litig.*,
   No. 5067-CC, 2009 Del. Ch. LEXIS 215 (Del. Ch. Dec. 18, 2009) .................................... 9, 10

*In re Ancestry.com, Inc. S'holder Litig.*,
   Consol. C.A. No. 7988-CS (TRANSCRIPT) .......................................................................... 11

*In re Appraisal of Dell Inc.*,
    2016 Del. Ch. LEXIS 81 (Del. Ch. May 31, 2016) ................................................. 7

*In re Atheros Communs., Inc. S'holder Litig*,
    C.A. No. 6124-VCN, 2011 Del. Ch. LEXIS 36 (Del. Ch. Mar. 4, 2011) ................................. 12

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................... 6

*In re Celera Corp. S'holder Litig.*,
    No. 6304-VCP, 2012 Del. Ch. LEXIS 66 (Del. Ch. Mar. 23, 2012) ........................................ 9

*In re Complete Genomics, Inc. S'holder Litig.*,
    C.A. 7888-VCL (Del. Ch. Nov. 9, 2012) .............................................. 12

*In re Del Monte Foods Co. S'holders Litig.*,
    25 A.3d 813 (Del. Ch. 2011) ................................................... 15

*In re ISN Software Corp. Appraisal Litig.*,
    No. 8388-VCG, 2016 Del. Ch. LEXIS 125 (Del. Ch. Aug. 11, 2016) ...................................... 8

*In re John Q. Hammons Hotels Inc. S'holder Litig.*,
    No. 758-CC, 2009 Del. Ch. LEXIS 174 (Del. Ch. Oct. 2, 2009) ........................................... 15

*In re Lear Corp. S'holder Litig.*,
    926 A.2d 94 (Del. Ch. 2007) ................................................... 12

*In re Rural Metro Corp. Stockholders Litig.*,
    88 A.3d 54 (Del. Ch. 2014) ................................................... 14

*In re Staples, Inc. Shareholders Litig.*,
    792 A.2d 934 (Del. Ch. 2001) ................................................... 18

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ................................................... 3, 7

*Laborers Local 235 Benefit Funds v. Starent Networks, Corp.*,
    No. 5002-CC, 2009 Del. Ch. LEXIS 210 (Del. Ch. Nov. 18, 2009) ....................................... 10

*Levas v. Vill. of Antioch, Ill.*,
    684 F.2d 446 (7th Cir. 1982) ................................................... 4

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
    148 F. Supp. 2d 1141 (D. Kan. 2001) ................................................... 5, 17, 18, 19

*Michigan v. United States Army Corps of Eng'rs*,
667 F.3d 765 (7th Cir. 2011) ........................................................... 4

*Mid-Continent Bancshares, Inc. v. O'Brien*,
No. 81-1395-C(C), 1981 U.S. Dist. LEXIS 17419 (E.D. Mo. Dec. 11, 1981) ........................ 18

*Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*,
824 A.2d 11 (Del. Ch. 2002) ........................................................... 13

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970) ........................................................... 18

*Ogden v. Marendt*,
264 F. Supp. 2d 785 (S.D. Ind. 2003) ........................................................... 21

*Parsons v. Jefferson-Pilot Corp.*,
789 F. Supp. 697 (M.D.N.C. 1992) ........................................................... 5

*Smith v. Robbins & Myers, Inc.*,
969 F. Supp. 2d 850 (S.D. Ohio 2013) ........................................................... 5, 6, 8, 16

*Sonesta Int'l Hotels Corp. v. Wellington Assoc.*,
483 F.2d 247 (2d Cir. 1973) ........................................................... 20

*St. Louis Police Ret. Sys. v. Severson*,
No. 12-CV-5086 YGR, 2012 U.S. Dist. LEXIS 152392 (N.D. Cal. Oct. 23, 2012) ......... 17, 19

*Standard Fin. v. Lasalle/Kross Partners L.P.*,
No. 96 C 8037, 1997 U.S. Dist. LEXIS 1916 (N.D. Ill. Feb. 10, 1997) ................... 18

*TSC Indus. v. Northway, Inc.*,
426 U.S. 438 (1976) ........................................................... 6, 11

*Turberg v. ArcSight, Inc.*,
C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011) (Settlement Hr'g Tr. at 43:4-15) ................... 16

*Ty, Inc. v. Jones Grp. Inc.*,
237 F.3d 891 (7th Cir. 2001) ........................................................... 4

*Wilson v. Great Am. Indus., Inc.*,
855 F.2d 987 (2d Cir. 1988) ........................................................... 13

**Statutes**

15 U.S.C. § 78n(a)(1) ........................................................... 6

iv

**Other Authorities**

Mary Jo White, Chair, U.S. Securities and Exchange Commission, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html ............................ 7

**Regulations**

17 C.F.R. § 240.14a-9 ............................................................................................................. 1, 6

17 C.F.R. § 244.100 ............................................................................................................. 1, 6, 7

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiff Ronald Suokko ("Plaintiff") respectfully submits this memorandum of law in support of his motion for a temporary restraining order and preliminary injunction enjoining the shareholder vote (the "Shareholder Vote") on the Proposed Merger between Accuride Corporation ("Accuride" or the "Company") and subsidiaries of investment funds advised by Crestview Advisors, LLC (collectively, "Crestview"), until Defendants[1] disclose certain material information they have omitted from the Definitive Proxy Statement ("Proxy")[2] filed with the Securities and Exchange Commission ("SEC") on October 17, 2016, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9") and SEC Regulation G, 17 C.F.R. § 244.100.

## NATURE AND STAGE OF PROCEEDING

On September 2, 2016, Accuride announced that it entered a merger agreement pursuant to which it will merge with subsidiaries of investment funds advised by Crestview (the "Proposed Merger"). Pursuant to the merger agreement, Accuride's shareholders stand to receive $2.58 in cash for each share of Accuride common stock they own (the "Merger Consideration").

On October 17, 2016, Defendants filed a definitive proxy statement (the "Proxy") with the SEC, which provides information about the Proposed Merger to Accuride's shareholders and recommends that they vote to approve the transaction. However, Defendants have omitted certain material information concerning the fairness of the Proposed Merger from the Proxy, including: (i) information and projections necessary to properly assess the non-GAAP (generally accepted accounting principles) financial projections included in the Proxy; (ii) whether certain parties that

---

[1]     Accuride and the members of its board of directors, John W. Risner, Richard F. Dauch, Keith E. Busse, Lewis Kling, Robin J. Adams, Robert E. Davis, and James R. Rulesh, are collectively referred to as the "Defendants."

[2]     The Definitive Proxy is attached as Exhibit 1 to the Declaration of Jason A. Shartzer in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Shartzer Decl.").

expressed interest in acquiring Accuride are currently bound by standstill agreements; (iii) the terms of Accuride management's post-Merger employment agreements and when discussions regarding their continued employment occurred; (iv) the feasibility of refinancing the Company's senior notes and the purported risks inherent in refinancing; (v) information concerning whether Accuride's financial advisor, Deutsche Bank Securities, Inc. ("Deutsche Bank") has provided or is currently providing services to a private equity firm affiliated with Individual Defendant Robert E. Davis; and (vi) financial metrics calculated in connection with the comparative valuation analyses performed by Deutsche Bank, which are being touted to the Company's shareholders as evidence that the Merger Consideration is fair to them. Accordingly, on October 24, 2016 Plaintiff filed his complaint alleging that Defendants violated the Exchange Act by filing the materially incomplete and misleading Proxy with the SEC.

Plaintiff now seeks to enjoin the Shareholder Vote until this material information, discussed in detail below, is provided to Accuride's shareholders.

## FACTUAL BACKGROUND: THE MERGER CONSIDERATION IS INADEQUATE AND IS THE RESULT OF A FLAWED SALES PROCESS

Accuride is a Delaware corporation with its principal executive offices located in Evansville, Indiana. ¶ 9.[3] The Company is one of the largest manufacturers and suppliers of commercial vehicle components in North America and has recently expanded operations into Europe. *Id.*

The Merger Consideration is inadequate and fails to properly compensate Accuride's shareholders for their shares. The $2.58 offer price is well-below the Company's 52-week trading high of $3.40, and is also significantly below the proposal to acquire the Company for $5.50 per share the Board received a little over a year ago. ¶¶ 2, 21, 39. Furthermore, as reflected by the

---

[3] All citations to "¶ _" refer to Plaintiff's complaint.

Company's recent financial performance, its long-term growth prospects as an independent company are strong, and the substantial investments the Company has made in recent years will place it in a strong position once the truck market rebounds from the current cyclical downturn. ¶¶ 39-40. Simply put, the Board has agreed to sell the Company at the most inopportune time and at a price that does not reflect its inherent value. The Board's and management's decision to sell the Company now may have been driven by the personal benefits they stand to reap if the Proposed Merger is consummated, including the accelerated vesting of restricted units and the prospect of continued employment with the post-merger company. ¶¶ 42-46.

Despite the inadequate Merger Consideration, Defendants now recommend that Accuride's shareholders vote in favor of the Proposed Merger. In order to secure shareholders' votes in favor of the Proposed Merger, Defendants have provided a materially incomplete and misleading summary of the information necessary for Accuride's shareholders to properly assess the financial and procedural fairness of the Proposed Merger. It is imperative that Accuride's shareholders receive the material information discussed below, so that they can make an informed decision cornering how to vote on the Proposed Merger. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) ("The purpose of § 14 (a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.").

## <u>LEGAL STANDARD AND ARGUMENT</u>

### I. The Temporary Restraining Order and Preliminary Injunction Standard

To obtain a preliminary injunction or temporary restraining order, "[t]he moving party must establish that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. Once the threshold

requirements are met, the court weights the equities, balancing each party's likelihood of success against the potential harms. The more the balance of harms tips in favor of an injunction, the lighter the burden on the party seeking the injunction to demonstrate that it will ultimately prevail." *Grote v. Sebelius*, 708 F.3d 850, 852 n.2 (7th Cir. 2013); *Levas v. Vill. of Antioch, Ill.*, 684 F.2d 446, 448 (7th Cir. 1982) (holding that unless a temporary restraining order is issued ex parte, the movant must make the same showing that is contemplated for a preliminary injunction). Here, Plaintiff has made a sufficient showing on each factor.

## II.     Plaintiff Is Likely to Succeed on His Exchange Act Claims

"As to the first element, plaintiffs can show a likelihood of success on the merits by demonstrating a 'better than negligible chance' of prevailing on at least one of their claims." *Domanus v. Lewicki*, 857 F. Supp. 2d 719, 724 (N.D. Ill. 2012) (citing *Ty, Inc. v. Jones Grp. Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)). In other words, "the often-repeated rule [is] that the threshold for establishing likelihood of success is low." *Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

### A.     Materiality is the Lynchpin to a Section 14(a) Claim, as all the Elements Fall into Place Once Materiality is Established

Here, Plaintiff alleges that Defendants violated Sections 14(a) and 20(a)[4] of the Exchange Act by filing the materially incomplete Proxy with the SEC and asking Accuride's shareholders to rely on the information contained therein and vote in favor of the Proposed Merger. "In order to establish a violation of section 14(a) and Rule 14a-9, plaintiff must prove three elements: (1) that the proxy contained a material misrepresentation or omission; (2) that the defendant was at least

---

[4]     Because Plaintiff's Section 14(a) claim is a predicate to his claim under Section 20(a), the Court need only consider whether Plaintiff is likely to succeed on his Section 14(a) claim for purposes of the instant motion. *See Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 875 (S.D. Ohio 2013) (noting that liability under § 20(a) requires a showing of a primary violation under § 14(a)).

negligent, and (3) that the proxy was the essential link in completing the transaction in question." *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1151 (D. Kan. 2001) (internal quotation marks omitted); *City of St. Clair Shores General Emps. Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.*, 635 F. Supp. 2d 783, 790-791 (N.D. Ill. 2009) (same).

Here, the second element is clearly established, because "[a]s a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [] negligence standard… a director may be found negligent under Section 14(a) for a failure to notice material omissions upon reading a proxy statement." *Brown v. Brewer*, No. CV 06-3731-GHK (SHX), 2010 U.S. Dist. LEXIS 60863, at *81 (C.D. Cal. June 17, 2010) (citations omitted) (internal quotation marks omitted).[5] Similarly, the third element is easily satisfied, as it is indisputable that the Definitive Proxy is an "essential link" necessary for the Proposed Merger to be consummated. *See Brown v. Brewer*, No. CV 06-3731-GHK (JTLx), 2008 U.S. Dist. LEXIS 108904, at *21 (C.D. Cal. July 14, 2008) ("Plaintiff here has adequately pled that the 2005 Proxy was an essential link in the approval of the Intermix merger with News Corp. Shareholder approval was required for consummation of that transaction. As such, we conclude that the [complaint] adequately pleads causation.").[6] Accordingly, the Court need only consider the materiality of the omitted information discussed below.

---

[5]     *See also Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 703 (M.D.N.C. 1992) (finding "[e]ach of the directors who reviewed the proxy statement" to be negligent for failing to notice language at issue).

[6]     *See also In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 292 n.3 (S.D.N.Y. 2010) ("The merger with Merrill could have been consummated only with BofA shareholder approval of the transaction… the Joint Proxy was an essential link in the transaction because the acquisition could not have occurred without the shareholder vote.").

**B.** **The Proxy Omits Material Information Necessary for Accuride's Shareholders to Assess the Fairness of the Proposed Merger, Rendering it Misleading**

Section 14(a) establishes liability for material misstatements or omissions in a proxy statement. 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). "When the proxy statement at issue is a proxy seeking shareholder approval of a corporate merger, the touchstone of a Section 14(a) violation based on omissions is materiality — something 'that a reasonable shareholder would consider important in deciding how to vote.'" *Robbins & Myers*, 969 F. Supp. 2d at 867 (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "This standard...does not require proof...that disclosure of the omitted fact would have caused the reasonable investor to change his vote. Rather, it contemplates a showing that the omitted fact would have assumed actual significance in the deliberation of the reasonable shareholder." *Id.* (citations omitted) (internal quotation marks omitted). Here, the Definitive Proxy omits the following material information.

**1. Information and Projections Necessary to Assess the Non-GAAP Projections Included in the Proxy**

First, Defendants have failed to disclose certain information necessary for Accuride shareholders to assess the non-GAAP (generally accepted accounting principles) financial projections included in the Proxy, in violation of Rule 14a-9 and SEC Regulation G, 17 C.F.R. 244.100.[7] In recent months, the SEC has begun to crack down on the widespread use of non-

---

[7] SEC Regulation G has two requirements: (1) a general disclosure requirement and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

GAAP financial measures in shareholder communications, because such measures lack consistent definitions and are often inherently misleading.[8]

Here, the Proxy fails to disclose: (i) the line item projections for the metrics used to calculate the non-GAAP measure "Unlevered Free Cash Flow" (*see* Proxy at 59); (ii) projections for the year ended December 31, 2016 for "net income (loss), cash from operations or other traditional indicators of operative performance and cash flows determined in accordance with GAAP" (*see* Proxy at 14); and (iii) whether stock-based compensation was treated as a cash or non-cash expense in connection with Deutsche Bank's Discounted Cash Flow Analysis ("DCF Analysis") (*see* Proxy at 59-60).

The Proxy notes that in preparing its DCF Analysis, which is widely considered to be the most important financial analysis underlying a fairness opinion,[9] Deutsche Bank utilized

---

[8] *See, e.g.*, Mary Jo White, Chair, U.S. Securities and Exchange Commission, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html ("[O]ur rules governing these communications make clear that the presentation of non-GAAP measures cannot be misleading and require that they be reconciled to the appropriate GAAP measure so that investors and analysts can compare them to the one that is consistently defined under the GAAP requirements…In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation…[L]ast month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data."). The SEC lacks the manpower and resources to adequately review the numerous filings it receives, which is the very reason why the federal securities laws provide shareholders with a private right of action. *See Borak*, 377 U.S. at 432 ("Private enforcement of the proxy rules provides a necessary supplement to Commission action.").

[9] *See, e.g., In re Appraisal of Dell Inc.*, 2016 Del. Ch. LEXIS 81, at *148 (Del. Ch. May 31, 2016) ("The DCF analysis is a well-established method of determining the going concern value of a corporation. The DCF methodology has featured prominently in this Court because it is the approach that merits the greatest confidence within the financial community."); *In re ISN Software Corp. Appraisal Litig.*, No. 8388-VCG, 2016 Del. Ch. LEXIS 125, at *2 (Del. Ch. Aug. 11, 2016) ("[A] discounted cash flow analysis is the most reliable indicator of fair value.").

projections for the Company's unlevered free cash flow, which were calculated based upon the following formula:

> (a) pension-adjusted EBITDA less depreciation and amortization, (b) less taxes on such amount, plus (c) depreciation and amortization, less (d) capital expenditures, less (e) change in net working capital, and less (f) where applicable, change in other assets and liabilities.

Proxy at 59.

Unlevered Free Cash Flow is a non-GAAP financial measure, and, as such, is calculated based upon unique and subjective determinations made by the Company and/or its financial advisor. Accordingly, the line item projections for the metrics used to calculate Unlevered Free Cash Flow (*i.e.* pension-adjusted EBITDA, depreciation and amortization, taxes on such amount, capital expenditures, change in net working capital, and change in other assets and liabilities) must be disclosed for Accuride shareholders to be able to properly assess the Unlevered Free Cash Flow Projections that are included in the Proxy. Proxy at 60. Significantly, while the Proxy includes projections for "Adjusted EBITDA," Proxy at 60-61, it does not include projections for the metric "*pension-adjusted* EBITDA," which is another unique, non-GAAP metric defined as "Adjusted EBITDA further adjusted for certain pension and post-employment benefit obligations." Proxy at 56. Once Defendants decided to disclose certain financial projections, particularly non-GAAP projections, they become bound to do so in a complete and accurate manner. *Robbins & Myers,* 969 F. Supp. 2d at 874 ("[I]f a Proxy discloses valuation information, it must be complete and accurate.").

Furthermore, the Proxy provides an update on "recent developments" with respect to Accuride's revised guidance for fiscal year 2016, and notes that "for the year ended December 31, 2016, revenue from continuing operations is expected to be in the range of $535 million to $545 million, Adjusted EBITDA is expected to be in the range of $68 million to $72 million and Free

8

Cash Flow is expected to be in the range of $2 million to $6 million, excluding approximately $10 million of negative Free Cash Flow related to Brillion prior to its divestiture." Proxy at 14. The Proxy then specifically notes that "Adjusted EBITDA and Free Cash Flow *should not be considered alternatives to net income (loss), cash from operations or other traditional indicators of operating performance and cash flows determined in accordance with accounting principles generally accepted in the United States*." *Id*. However, Defendants have failed to provide Accuride shareholders with the revised fiscal year 2016 projections for net income (loss), cash from operations or other traditional indicators of operating performance and cash flows determined in accordance with GAAP, rendering the disclosed revised Adjusted EBITDA and Free Cash Flow projections for fiscal year 2016 materially incomplete and misleading.

Lastly, the Proxy fails to disclose whether stock-based-compensation was treated as a cash or non-cash expense for purposes of calculating the Unlevered Free Cash Flow projections Deutsche Bank utilized in its DCF Analysis. It is important for shareholders to know how stock-based compensation was treated, because treating it as a cash expense is often considered to be atypical, and reduces the value of the company. *See, e.g., In re Celera Corp. S'holder Litig.*, No. 6304-VCP, 2012 Del. Ch. LEXIS 66, at *87-88 (Del. Ch. Mar. 23, 2012) (finding the treatment of stock-based compensation as a cash expense "unusual"); *In re 3Com S'holders Litig.*, No. 5067-CC, 2009 Del. Ch. LEXIS 215, at *11-12 (Del. Ch. Dec. 18, 2009) (referring to the treatment of stock-based compensation as a cash expense as "a departure from the norm in conducting [a] discounted cash flow analysis."). Accordingly, a proxy statement should disclose whether stock-based compensation is treated as a cash or no-cash expense. *Laborers Local 235 Benefit Funds v. Starent Networks*, *Corp.*, No. 5002-CC, 2009 Del. Ch. LEXIS 210, at *2 (Del. Ch. Nov. 18, 2009) ("Though there may be a valid reason for the treatment of the stock-based compensation in the discounted cash flow analysis, that this detour is not disclosed or otherwise highlighted in the

relevant proxy statement section gives me pause."); *In re 3Com S'holders Litig.*, 2009 Del. Ch. LEXIS 215, at *12 (noting importance of disclosing how stock-based compensation was treated so that "shareholders can plainly determine from reading the proxy that [the banker] made a departure from the norm in conducting its discounted cash flow analysis.").

## 2. Whether Certain Parties That Expressed Interest in Acquiring Accuride Are Currently Bound by Standstill Agreements

In the process leading up to the announcement of the Proposed Merger, certain parties interested in acquiring Accuride entered into confidentiality agreements containing a customary standstill provision that included a "sunset" provision that allowed the counterparty to submit competing proposals if the Company entered a change of control transaction with another party. Proxy at 30-32, 34, 37-39. However, the Company also entered into several confidentiality agreements that included standstill provisions that did *not* include a sunset provision, and the Proxy fails to disclose information regarding the terms of these multiple non-customary standstill provisions. Proxy at 33, 38, 40. Specifically, the Proxy fails to state whether the standstill provisions in the confidentiality agreements the Company entered into with Party B, Party L, Party M, and Party N remain in place, thereby foreclosing these parties from taking actions to provide Accuride shareholders with a superior (and, in the case of Party L, with a public superior) proposal.

Such information is material to Accuride shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The omission of this information also renders the descriptions of the standstill provisions the Company entered into materially incomplete and misleading. Any reasonable stockholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to "significantly alter[s] the total mix of information." *TSC Indus.*, 426 U.S. at 449; *see also In re Celera Corp. S'holder Litig.*, 2012 Del. Ch. LEXIS 66, at *77-83 (noting how standstill provisions can be "problematic" because they foreclose interested parties from making

10

superior offers).  Further, in *In re Ancestry.com, Inc. S'holder Litig.*, the court enjoined consummation of the challenged transaction pending an accurate disclosure of the significance of standstill provisions.  In so ordering, the court stated:

> I think it would have created the false impression that any of the folks who signed the standstill could have made a superior proposal. That's not true.  They could only make it by breaching the standstill. Because in order to make the superior proposal, you would have to request for a waiver, either directly or indirectly.

*In re Ancestry.com, Inc. S'holder Litig.*, Consol. C.A. No. 7988-CS, at 228-29 (TRANSCRIPT) (Shartzer Decl. Ex. 3).  Here, the Proxy, as currently written, fails to disclose whether certain non-customary standstill agreements remain in effect, and therefore materially misleads Accuride stockholders as to the viability of a previously engaged party re-entering the bidding process. Accordingly, at the very least, Accuride shareholders must be informed of whether these non-customary agreements remain in effect and, if so, that potential alternative bidders are prohibited from submitting an alternative proposal as a result.

### 3. The Terms of Accuride Management's Post-Merger Employment Agreements and When Discussions Regarding Their Continued Employment Occurred

The Proxy is also lacking material information regarding Accuride management's post-transaction employment arrangements and when negotiations regarding their continued employment occurred – despite the revelation in the press release announcing the Merger Agreement that the Company's current management team is expected to continue to lead the combined company.  The failure to disclose the specific terms of any post-close employment arrangements with the Company's management is especially material given the Proxy's disclosure of information relating to management's compensation upon a change of control.  Proxy at 62-66. Most important, the Proxy fails to disclose when such post-close employment arrangements were

negotiated, who negotiated them on management's behalf, and whether and to what extent the Board was made aware of such negotiations either before or after they took place. This information is especially material given that, according to the Proxy, members of management communicated with several interested parties throughout the strategic review process.

The omission of this information renders the sections of the Proxy discussing the "interests of the directors and executive of Accuride in the merger" materially incomplete and misleading, as shareholders are unable to properly assess how management's post-close employment influenced the strategic review process and negotiations regarding the Merger Consideration and Merger Agreement. Moreover, it is well-settled that information regarding post-close employment opportunities with the combined company is material to stockholders. *See In re Atheros Communs., Inc. S'holder Litig*, C.A. No. 6124-VCN, 2011 Del. Ch. LEXIS 36, at *41-42 (Del. Ch. Mar. 4, 2011) (holding that "[k]nowledge that, even though specific terms were not elicited until later in the process, [an insider] was aware that he would receive an offer of employment from [a specific buyer] at the same time he was negotiating . . . would be important to a reasonable shareholder's decision regarding the transaction."); *In re Complete Genomics, Inc. S'holder Litig.*, C.A. 7888-VCL (Del. Ch. Nov. 9, 2012) (granting preliminary injunction in part due to lack of disclosure of communications concerning CEO's expected continuing post-transaction employment); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) ("Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").[10]

---

[10] *See also Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 15 (Del. Ch. 2002) (stating that the "relevant inquiry is not whether an actual conflict of interest exists, but

Accordingly, the Proxy Statement must be amended to disclose the specific timing and scope of any discussions regarding the continued employment of Accuride's executive officers.

### 4. The Feasibility of Refinancing the Company's Senior Notes and Purported Risks Inherent in Refinancing

Additionally, in determining that the Proposed Transaction was more favorable than remaining an independent public company, the Proxy discloses that the Board considered risks inherent in refinancing the Company's existing debt. Proxy at 50. The Proxy fails to disclose information concerning these alleged inherent risks, rendering the statement regarding this risk materially incomplete and misleading. This information is particularly material because a large Accuride shareholder, Coliseum Capital Management, LLC ("Coliseum"), has urged other shareholders to vote against the Proposed Merger in part because it believes Accuride's senior notes can be refinanced without significant difficulty.[11] It is therefore imperative that shareholders have sufficient information regarding the "risks inherent in refinancing the [Company's] existing indebtedness." Without such information, shareholders cannot properly assess whether to believe the Company or Coliseum regarding the feasibility of refinancing the Company's senior secured notes.

---

rather whether full disclosure of potential conflicts of interest has been made"); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 994 (2d Cir. 1988) (providing that relevant inquiry is whether full disclosure of potential of conflicts of interest has been made); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 194 (Del. Ch. 2007) (observing that management's conflicts of interests regarding continued employment could cause them to tilt the process in favor of the bidder that had committed to retain them).

[11] Schedule 14A, *Coliseum Capital Management Urges Accuride Stockholders To Vote Against Crestview Partners Proposed Merger*, (Oct. 21, 2016) https://www.sec.gov/Archives/edgar/data/817979/000089534516000573/wddfan14a-accuride_coliseum.htm (Shartzer Decl. Ex. 2).

### 5. Information Concerning Whether Deutsche Bank Has Provided or Is Currently Providing Services to Cetus Capital, LLC or its Affiliates

Further, the Proxy fails to disclose whether Deutsche Bank has provided or is currently providing any financial advisory services to Cetus Capital, LLC ("Cetus") or its affiliates for which it has or will receive compensation. Cetus is tied to Individual Defendant Robert E. Davis, who serves as a Managing Director of a Cetus affiliate. Proxy at 13. Cetus and certain of its affiliates, including Individual Defendant Davis (collectively, the "Cetus Holders") have entered into a voting agreement pursuant to which they have agreed to vote the 17.2% of the Company's outstanding common stock they hold in favor of the Proposed Merger. Proxy at 13, 78. Because Cetus is affiliated with Individual Defendant Davis, who has personal interests in the Proposed Merger that are divergent from the Company's common stockholders, ¶¶ 43-46, Proxy at 63, Cetus' interests are not fully aligned with the Company's remaining shareholders. Indeed, while Cetus has pledged to support the Proposed Merger, a similarly large shareholder, Coliseum Capital Management, LLC, has solicited shareholders to vote against the Proposed Merger. Given Cetus' divergent interests, it is imperative that Accuride's shareholders have a full understanding of the relationship between Cetus and Deutsche Bank, the financial advisor whose fairness opinion they are being told they should rely upon.

Court have repeatedly emphasized, "[i]nformation that bears on whether an investment bank faces conflicts of interest is material to stockholders when deciding how to vote on a merger…" *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 105 (Del. Ch. 2014) (collecting cases).[12] "It is imperative for the stockholders to be able to understand what factors *might* influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed [merger] must be carefully considered in assessing how much

---

[12] *David P. Simonetti Rollover ISA v. Margolis*, No. 3694-VCN, 2008 Del. Ch. LEXIS 78, at *25-26 (Del. Ch. June 27, 2008) (same); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. 2011) (same); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. 758-CC, 2009 Del. Ch. LEXIS 174, at *55-56 (Del. Ch. Oct. 2, 2009) (same).

credence to give its analysis. For that reason, the benefits of the Merger to the investment banker, beyond its expected fee, must also be disclosed to the stockholders." *Id*. Accordingly, information concerning the relationship between the financial advisor and other entities and individuals who stand to benefit from the transaction are also material to stockholders. *See id*. Further, "[t]here is no rule that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict." *Id*. Thus, all factors that may entice a financial advisor to favor a particular transaction must be fully disclosed. *See id*.

Based on the foregoing, it is imperative that Accuride's shareholders be made aware of any relationship between Deutsche Bank and Cetus. As has long been recognized, where an investment bank is providing a fairness opinion for a transaction favored by its long-standing clients, "it may be influenced to find [the] transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction, as this will ensure future lucrative business." *Id*. at 106.

### 6. Information Necessary to Assess Deutsche Bank's Selected Companies Analysis and Selected Transactions Analysis

Finally, Defendants have failed to disclose material information concerning Deutsche Bank's Selected Companies Analysis and Sum-of-the-Parts Selected Transactions Analysis. Proxy at 56-57. Specifically, The Proxy fails to disclose the individual multiples for each of the eight companies Deutsche bank utilized for its Selected Companies Analysis and for each of the sixteen transactions it utilized for its Sum-of-the-Parts Selected Transactions Analysis.

Numerous courts have recognized the significance of the multiples observed in connection with Selected Companies and Precedent Transactions Analyses. For example, in *Robbins & Myers*, the court denied defendants' motion to dismiss plaintiff's Section 14(a) and 20(a) claims, which were premised in part on the failure to disclose the individually observed multiples in connection with the financial advisor's Precedent Transactions and Selected Companies Analyses.

969 F. Supp. 2d at 872-74. The court specifically reasoned that the omitted multiples constituted material, "critical financial" information, that was necessary for the company's shareholders to make an informed decision in connection with an all-cash merger and to determine whether the financial advisor's analyses contained flaws. *Id.*

Similarly, in *Turberg v. ArcSight, Inc.,* C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011) (Settlement Hr'g Tr. at 43:4-15) (Shartzer Decl. Ex. 4), the Delaware Court of Chancery noted the significance of individual company and transaction multiples in connection with assessing the valuation analyses a banker performs in support of a merger fairness opinion:

> "In terms of the… disclosures… there are things that I think are very helpful**… if you were to consider what really constitutes a fair summary, then the background multiples should be in there, just like they're in there when you give them to the board. . . . [y]ou would never see a board book that would go to the board without the background multiples.** You would never expect the board to simply hear from the banker, 'oh, well, we selected range.' And one would not want to defend the due care injunction case where that was the situation. So I think that that information was certainly helpful and important…"

The same reasoning supports the materiality of the omitted individual multiples here. Indeed, it is commonly acknowledged in merger-related SEC filings that simple mathematical analysis, such as determining the mean and median, is not in itself a meaningful method of using data extracted from examination of publicly traded companies and precedent merger transactions. The individual multiple data omitted from the Proxy is widely considered to be important by valuation practitioners, who deem such benchmarking data important to assess "relative ranking [and determine] those companies most appropriate for framing its valuation." Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*; Hoboken: John Wiley & Sons, 2013.

### III. Accuride's Public Shareholders Will Be Irreparably Harmed Absent a Preliminary Injunction

Plaintiff and Accuride's other public shareholders will suffer irreparable harm by being forced to decide how to vote on the Proposed Merger without the material information referenced above. "An uninformed shareholder vote is often considered an irreparable harm, particularly because the raison d'etre of many of the securities laws is to ensure that shareholders make informed decisions." *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, No. SACV 14-1214 DOC(ANx), 2014 U.S. Dist. LEXIS 156227, at *50 (C.D. Cal. Nov. 4, 2014). As another U.S. District Court stated in an analogous context:

> The Supreme Court has recognized that use of solicitation which is materially misleading poses the kind of irreparable injury to stockholders which can justify injunctive relief prior to a shareholder's meeting…irreparable injury would occur absent an injunction prohibiting the voting of proxies based upon false and misleading information. At a minimum, the free and intelligent voting rights of plaintiff's shareholders will be forfeited if such votes are exercised based upon false or misleading information. Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights.

*Lone Star*, 148 F. Supp. 2d at 1149-50 (internal quotation marks omitted).

Courts across the country have found that this exact threat of irreparable harm is sufficient to enjoin a proposed merger until defendants provide additional information concerning the transaction to shareholders. *Id.*; *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086 YGR, 2012 U.S. Dist. LEXIS 152392, at *16-17 (N.D. Cal. Oct. 23, 2012) ("disclosure deficiencies cannot be remedied effectively by an 'after-the-fact damages' case. Thus, 'it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.'") (quoting *In re Staples, Inc. Shareholders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001)). Courts in the Seventh Circuit have followed suit. *See, e.g., Chambers v. Briggs & Stratton Corp.*, 863 F. Supp. 900, 905 (E.D. Wis. 1994) ("Since the

defendant's proxy statement contained a material omission, the shareholder vote will go forward on the basis of potentially misleading information unless the court grants the plaintiff's request for injunctive relief. The Supreme Court has recognized that 'use of solicitation which is materially misleading poses the kind of irreparable injury to stockholders which can justify injunctive relief prior to a shareholder's meeting.'") (quoting *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 383 (1970)); *Standard Fin. v. Lasalle/Kross Partners L.P*., No. 96 C 8037, 1997 U.S. Dist. LEXIS 1916, at *18 (N.D. Ill. Feb. 10, 1997) ("I conclude that defendants' failure to provide Standard's shareholders and the investing public with accurate disclosures in compliance with Section 13(d) supports a finding of irreparable harm.").

Accordingly, Plaintiff has established that he and Accuride's other public shareholders "would suffer irreparable injury in the absence of injunctive relief designed to remedy any false or misleading information in defendant's Proxy Statement[]." *Lone Star,* 148 F. Supp. 2d at 1150.

## IV.    The Balance of Hardships Tips in Plaintiff's Favor and an Injunction Is in the Public Interest

"[A]n injunction is in the public interest insofar as it is necessary to effectuate the policies of the Securities Exchange Act of 1934…" *Mid-Continent Bancshares, Inc. v. O'Brien*, No. 81-1395-C(C), 1981 U.S. Dist. LEXIS 17419, at *33 (E.D. Mo. Dec. 11, 1981); *Chambers*, 863 F. Supp. at 906 ("Given the overriding public interest in the full and accurate disclosure of information to shareholders of public corporations to ensure that a shareholder's vote is based upon accurate and complete information, I believe that this factor weighs in favor of granting a preliminary injunction. Allowing a shareholder vote based on incomplete and inaccurate information undermines the purpose underlying SEC Rule 14a-9.").

Here, given that Plaintiff only seeks an order enjoining the Shareholder Vote until Defendants provide Accuride's shareholders with the narrow and readily available material information discussed above, the balance of equities heavily weigh in Plaintiff's favor and an

injunction is in the public interest. Indeed, "[a] fully informed shareholder vote in compliance with Section 14(a) of the Securities Exchange Act [ ] is in the best interests of shareholders and the shareholding public generally." *St. Louis Police Ret. Sys.*, 2012 U.S. Dist. LEXIS 152392, at *17. As another court stated in a recent opinion granting a motion for a preliminary injunction based upon materially incomplete and misleading SEC filings made in connection with a merger transaction:

> If the Court orders corrective disclosures, Defendants would only incur the expense of making those disclosures. An injunction ordering corrective disclosures is also in the public interest, as it prevents an uninformed shareholder vote. Thus, the Court finds that the potential threat of an uninformed vote in this case presents an irreparable harm, that the balance of equities tips in Plaintiffs' favor, and that the proposed injunction to make corrective disclosures is in the public interest.

*Allergan, Inc.*, 2014 U.S. Dist. LEXIS 156227, at *51.

And as another U.S. District Court stated in analogous circumstances:

> [P]laintiff is asking the court to order defendant to make a corrective disclosure filing with the SEC. Such a filing would take a brief amount of time to prepare and file and would involve little expense. The hardship to defendant should the injunction issue is thus minimal. Finally, the court finds that the requested injunction would not be adverse to the public interest. Indeed, the public interest always lies with the truth. Again assuming the existence of materially misleading information, a full disclosure of such information, prior to any vote based thereon, will best serve the shareholding public.

*Lone Star*, 148 F. Supp. 2d at 1150.

Absent injunctive relief, Plaintiff and Accuride's other public shareholders will be forced to make a decision about how to vote on the Proposed Merger without the material information identified above. In contrast, any required postponement of the Shareholder Vote would delay the consummation of the Proposed Merger – *if at all* - for only so long as would be necessary for Accuride's shareholders to digest the newly disclosed information. Indeed, "when it appears likely

that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated." *Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 250-51 (2d Cir. 1973); *see also Simonetti,* 2008 Del. Ch. LEXIS 78, at *47-48 ("Ordinarily, balancing the equities between (a) ordering full and complete disclosure to enable stockholders to make an informed decision and (b) a short delay required to allow additional disclosure is a fairly simple task… the equities clearly favor the interim relief necessary to allow the stockholders the opportunity to be an informed voter[.]").

## V.     No Security Is Necessary

"Despite the language of Rule 65(c), a district court may waive the injunctive bond requirement if there is no danger that the opposing party will incur any damages from the injunction." *Bader v. Wernert*, No. 1:15-CV-375-TLS, 2016 U.S. Dist. LEXIS 50614, at *104 (N.D. Ind. April 14, 2016) (citing *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)).

Because Plaintiff only seeks a brief injunction to enjoin the Shareholder Vote for only so long as necessary to allow Accuride stockholders to receive and absorb the supplemental disclosures, Defendants will suffer minimal, if any, financial harm.   Accordingly, Plaintiff respectfully submits that no bond, or at most, a nominal bond, should be required.   *Ogden v. Marendt*, 264 F. Supp. 2d 785, 795 (S.D. Ind. 2003) (waiving bond requirement where defendant would not "incur any significant costs a result of the injunction" and an injunction was in the public interest); *Bader*, 2016 U.S. Dist. LEXIS 50614, *104 (waiving bond requirement); *Gutierrez v. City of E. Chi.*, No. 2:16-CV-111, 2016 U.S. Dist. LEXIS 138374, *39-40 (N.D. Ind. Sept. 6, 2016)

(waiving bond requirement); *Bender v. Jordan*, 439 F. Supp. 2d 139, 179 (D.D.C. 2006) (granting preliminary injunction enjoining shareholders' meetings and requiring $20,000 bond).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enjoin the Shareholder Vote until Defendants disclose the material information discussed above.

Dated: October 25, 2016                                           Respectfully submitted,

SHARTZER LAW FIRM, LLC
By: /s/ Jason A. Shartzer
Jason A. Shartzer, Attorney No: 23989-49
SHARTZER LAW FIRM, LLC
156 East Market Street
Suite 1000
Indianapolis, IN 46204
Tel.: (317) 969-7600
Fax: (317) 969-7650
E-mail: jshartzer@shartzerlaw.com
*Attorney for Plaintiff*

**OF COUNSEL:**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed electronically with the above-captioned court, with notice of case activity to be generated and sent electronically by the Clerk of said court (with a copy to be mailed to any individuals who do not receive electronic notice from the Clerk) this October 25, 2016:

Accuride Corporation
c/o CT Corporation System, Reg. Agent
150 West Market Street
Indianapolis, IN 46204

Robert E. Davis
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

Keith E. Busse
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

Richard F. Dauch
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

Lewis Kling
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

James R. Rulseh
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

John W. Risner
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

Robert J. Adams
c/o Accuride Corporation
7140 Office Circle
Evansville, IN 47715

By: /s/ Jason A. Shartzer
Jason A. Shartzer, Attorney No: 23989-49
SHARTZER LAW FIRM, LLC
156 East Market Street
Suite 1000
Indianapolis, IN 46204
Tel.: (317) 969-7600
Fax: (317) 969-7650
E-mail: jshartzer@shartzerlaw.com
*Attorney for Plaintiff*